J-S06008-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| DENNIS B. JOHNSON, | |
| Appellant | No. 2706 EDA 2013 |

Appeal from the PCRA Order Entered September 9, 2013
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0007319-2009

BEFORE: BENDER, P.J.E., LAZARUS, J., and FITZGERALD, J.[*]

MEMORANDUM BY BENDER, P.J.E.: **FILED FEBRUARY 23, 2015**

Appellant, Dennis B. Johnson, appeals from the post-conviction court's September 9, 2013 order denying, without a hearing, his first petition for relief under the Post Conviction Relief Act (PCRA), 42 Pa.C.S. §§ 9541–9546. Appellant is currently serving a life sentence for his conviction of second degree murder, robbery, and a violation of the Uniform Firearms Act. Appellant raises four claims asserting the ineffective assistance of his trial counsel. After careful review, we affirm.

The following facts were adduced at Appellant's trial. On August 27, 2007, Appellant, Curtis Smith (Curtis), and Amin Vicks were at a convenience store located at 30th Street and Lehigh Avenue in Philadelphia,

_____

[*] Former Justice specially assigned to the Superior Court.

where Ozzie Clark (Clark) was working as the sole clerk. At the time Curtis arrived, the doors to the store were locked, and business was being conducted through a window on the side of the store.

Curtis identified Appellant in court, and testified that he knew Appellant all of his life. N.T., 9/28/10, at 112-14. While Curtis was at the window completing his purchase of cigars, he heard a commotion. Curtis turned to see Appellant "with a gun out[,]" and pointed at the chest of the victim, Kenyatta Smith (Kenyatta or "the victim"). *Id.* at 126, 136. Curtis also heard Appellant say to the victim, "Put everything on the steps or something like that." *Id.* at 128. He then observed Kenyatta place his personal effects, including a phone, on the steps. He also heard Appellant instruct the victim not to touch the items. When he observed what was going on, Curtis asked Appellant, "Yo, what [are] you doing, Dog?" *Id.* at 126. Soon thereafter, Curtis heard gunshots.[1] *Id.* He immediately ran away, explaining that "When somebody is shooting a gun, I'm moving out of the way so I don't get hit." *Id.* at 160.

_____

[1] There does not appear to be any dispute that Curtis also testified that he saw Appellant shoot the victim. However, the relevant portion of the transcript in which this testimony occurred is missing from the certified record. Nevertheless, during cross-examination, Appellant's counsel clearly alludes to this testimony, asking Curtis, "But then you testified that you saw it. My question is, how could you see it if … you were around the corner hearing it?" N.T., 9/28/10, at 161-62. Curtis explained that he was standing at the corner of the store, that his view was not obstructed by the building, and that he had no difficulty observing the shooting and the events that immediately preceded it. *Id.* at 163-64.

Clark also testified for the Commonwealth. He had worked at his parents' business, the convenience store located at 30th Street and Lehigh Avenue, since he was a child. Clark identified Appellant in court, indicating that he had known him for 5 or 6 six years at the time of the shooting. N.T., 9/29/10, at 41. Appellant would frequent the convenience store about once or twice a week as a customer. Clark knew Kenyatta as a frequent customer at the store as well, and further recalled that Kenyatta was a nighttime security guard at a local pool. Clark also indicated that he knew Amin Vicks and Curtis, as they were also regular customers.

Clark was working alone the evening of the shooting. He saw Curtis, Amin Vicks, and Appellant approach the store. Kenyatta arrived at nearly the same time on a bicycle. Kenyatta purchased a few items first. While he was taking an order for Amin Vicks or Curtis, Clark noticed Appellant holding Kenyatta at gunpoint with a chrome revolver, and rifling through the victim's pockets. Clark heard Appellant say something like, "you want to get popped, Oldhead?" *Id.* at 54. Clark believed that Appellant said this when Kenyatta resisted giving up his phone. *Id.* at 61. Immediately thereafter, Clark heard a gunshot ring out, and saw everyone run away, including Kenyatta, who only ran for a short time before collapsing. Clark indicated that he was only about eleven feet from where the shooting took place, and that he heard only one shot. Immediately after the shooting, Clark called the police and then tried to attend to Kenyatta, who was "[b]arely breathing." *Id.* at 66.

Police Officer Lewis Grandizio, a firearms expert, testified that he analyzed the bullet taken from Kenyatta's body. It was consistent with being fired from a .32 caliber revolver. Dr. Gary Collins, an assistant medical examiner for the Philadelphia Medical Examiner's Office, reviewed the report of the autopsy that had been performed by Dr. Gregory McDonald.[2] Dr. Collins concluded that Kenyatta died of a single gunshot wound to the right side of his chest under the armpit, and that the manner of death was homicide. The single bullet had penetrated the victim's liver, heart, and left lung.

On September 30, 2009, Appellant was convicted by a jury of the above-listed offenses. On November 2, 2010, the trial court sentenced Appellant to life imprisonment for second degree murder, and concurrent terms of 5-10 years' and 3½-7 years' imprisonment for robbery and the firearms violation, respectively. Appellant filed a direct appeal, but that appeal was ultimately discontinued on September 9, 2009, before a brief was filed with this Court.

Appellant filed a counseled PCRA petition, his first, on July 20, 2012.[3] The Commonwealth filed a motion to dismiss on February 2, 2013.

_____

[2] Dr. McDonald was no longer employed with the Philadelphia Medical Examiner's Office at the time of Appellant's trial.

[3] This petition was titled "Amended [PCRA] Petition," however, the lower court docket does not indicate that any prior PCRA petition was filed by Appellant.

Appellant filed a response to the Commonwealth's motion to dismiss on March 5, 2013. Subsequently, on July 9, 2013, the PCRA court issued notice of its intent to dismiss Appellant's PCRA petition without a hearing pursuant to Pa.R.Crim.P. 907. Appellant's petition was susequently dismissed by the court by order dated September 9, 2013.

Appellant filed a timely notice of appeal to this Court from that order on October 4, 2013. He also filed a timely Pa.R.A.P. 1925(b) statement with the PCRA court, which then filed its Rule 1925(a) opinion on July 15, 2014. Appellant now presents the following questions for our review:

I. Was trial counsel ineffective because he failed to object to the charge of the court which failed to define robbery and its intent elements, robbery being the statutorily enumerated felony on which Appellant's second degree murder conviction was predicated?

II. Was trial counsel ineffective because he failed to object on confrontation clause grounds and on hearsay grounds to detective McDermott's testimony that Amin Vicks, who did not testify, when reinterviewed informed detectives "that Curtis Smith was there, Dennis Johnson [Appellant] was the shooter…"?

III. Was trial counsel ineffective because he failed to object to the introduction of testimony from a medical examiner who did not perform the autopsy and who was substituting for the medical examiner who did perform the autopsy?

IV. Was trial counsel ineffective because he failed to ask for a cautionary ***Kloiber***[4] instruction because the

---

[4] ***Commonwealth v. Kloiber***, 106 A.2d 820, 826-27 (Pa. 1954) (holding that "where the witness is not in a position to clearly observe the assailant, or he is not positive as to identity, or his positive statements as to identity are weakened by qualification or by failure to identify defendant on one or
*(Footnote Continued Next Page)*

Commonwealth's case rested entirely on the identifications [of Appellant] made by Curtis Smith and Ozzie Clark, when each of them had not identified Appellant to the police when interviewed after the crime and at other times?

Appellant's Brief at 5 (unnecessary capitalization omitted).

We review an order dismissing a petition under the PCRA in the light most favorable to the prevailing party at the PCRA level. This review is limited to the findings of the PCRA court and the evidence of record. We will not disturb a PCRA court's ruling if it is supported by evidence of record and is free of legal error. This Court may affirm a PCRA court's decision on any grounds if the record supports it. Further, we grant great deference to the factual findings of the PCRA court and will not disturb those findings unless they have no support in the record. However, we afford no such deference to its legal conclusions. Where the petitioner raises questions of law, our standard of review is *de novo* and our scope of review [is] plenary.

***Commonwealth v. Ford***, 44 A.3d 1190, 1194 (Pa. Super. 2012) (internal

citations omitted).

Appellant presents four ineffective assistance of counsel (IAC) claims.

In reviewing such claims:

We begin with the presumption that counsel rendered effective assistance. To obtain relief on a claim of ineffective assistance of counsel, a petitioner must rebut that presumption and demonstrate that counsel's performance was deficient, and that such performance prejudiced him. ***Strickland v. Washington***, 466 U.S. 668, 687–91, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In our Commonwealth, we have rearticulated the ***Strickland*** Court's performance and prejudice inquiry as a three-prong test. Specifically, a petitioner must show: (1) the underlying claim is of arguable merit; (2) no reasonable basis existed for counsel's

*(Footnote Continued)* _____

more prior occasions, the accuracy of the identification is so doubtful that the Court should warn the jury that the testimony as to identity must be received with caution").

action or inaction; and (3) counsel's error caused prejudice such that there is a reasonable probability that the result of the proceeding would have been different absent such error. **Commonwealth v. Pierce**, 515 Pa. 153, 158–59, 527 A.2d 973, 975 (1987).

**Commonwealth v. Dennis**, 17 A.3d 297, 301 (Pa. 2011) (some internal citations omitted).

## I.

Appellant's first claim concerns the trial court's jury instructions regarding the definition of robbery, the predicate offense for Appellant's second degree murder conviction.[5] "For a verdict to be founded on second degree murder, the jury must be instructed as to the elements of the alleged felonies." **Commonwealth v. May**, 656 A.2d 1335, 1343 (Pa. 1995). Here, Appellant asserts that the trial court failed to instruct the jury on the elements of robbery, and that trial counsel was ineffective for failing to object to the jury instructions on that basis. He contends that he was prejudiced by this error because the jury might have convicted him under an incorrect definition of robbery, which would also undermine Appellant's conviction for second degree murder. **Id**. Specifically, Appellant contends

_____

[5] "A criminal homicide constitutes murder of the second degree when it is committed while defendant was engaged as a principal or an accomplice in the perpetration of a felony." 18 Pa.C.S. § 2502(b). The statute further explains the phrase "perpetration of a felony" as follows: "The act of the defendant in engaging in or being an accomplice in the commission of, or an attempt to commit, or flight after committing, or attempting to commit _robbery_, rape, or deviate sexual intercourse by force or threat of force, arson, burglary or kidnapping." 18 Pa.C.S. § 2502(d) (emphasis added).

that the "trial court never defined robbery in terms of the element of intent and never required the jury to find, beyond a reasonable doubt, Appellant harbored an intent to rob." Appellant's Brief at 12.

In considering the underlying merits of this IAC claim, we consider the following standards:

> When reviewing a challenge to jury instructions, the reviewing court must consider the charge as a whole to determine if the charge was inadequate, erroneous, or prejudicial. "The trial court has broad discretion in phrasing its instructions, and may choose its own wording so long as the law is clearly, adequately, and accurately presented to the jury for its consideration." ***Commonwealth v. Prosdocimo***, 525 Pa. 147, 578 A.2d 1273, 1274 (1990). A new trial is required on account of an erroneous jury instruction only if the instruction under review contained fundamental error, misled, or confused the jury.

***Commonwealth v. Fletcher***, 986 A.2d 759, 792 (Pa. 2009) (some internal citations omitted).

In the instant case, the trial court instructed the jury, in pertinent part, as follows:

> The Defendant has been charged with robbery. To find the Defendant guilty of this offense[,] you must find that the following two elements have been proven beyond a reasonable doubt: that the Defendant killed Kenyatta Smith. Second, that the defendant did this during the course of a theft.
>
> During the course of committing means that you could find the Defendant guilty if you find beyond a reasonable doubt that he did these things either – and that refers to the killing. Either while – I'm sorry. That he did these things either while actually committing a theft, attempting to commit a theft, or while fleeing after either committing or attempting to commit a theft.
>
> A theft[,] of course[,] means taking unlawful control of or exercising unlawful control over someone else's property and

intending not to give it back. The Defendant is charged with second degree murder. I will start [with] some terminology and basic principles. The more serious types of crimes are called felonies. For example, robbery is a felony.

Second degree murder is called felony murder because it's a killing connected with a felony. The felon need [] not intend to kill anyone or anticipate that anyone be killed.

The Defendant has been charged with second degree murder, that is[,] felony murder. To find the Defendant guilty of this offense[,] you must find that the following three elements have been proven beyond a reasonable doubt:

First, that the Defendant killed Kenyatta Smith. Second, that the Defendant did so while committing a robbery. Third, that the Defendant was acting with malice.

You may find that the Defendant acted with malice if you are satisfied beyond a reasonable doubt that he committed the robbery. Because robbery is a crime inherently dangerous to human life[,] there does not have to be any other proof of malice. And[,] I have already defined robbery for you.

N.T., 9/30/10, at 103-05.

Appellant contends that the court failed to instruct the jury that it was required to find, beyond a reasonable doubt, that Appellant *intended to rob* the victim to sustain a conviction for robbery. We disagree. No such intent element is required by the statute defining the offense. Section 3701 of the Crimes Code defines robbery as follows:

**(a) Offense defined.--**

(1) A person is guilty of robbery if, in the course of committing a theft, he:

(i) inflicts serious bodily injury upon another;

18 Pa.C.S. § 3701(a).

The trial court's instructions mirror the statutory definition of robbery with a single caveat: the trial court replaced the infliction-of-serious-bodily-injury element with "the Defendant killed Kenyatta Smith." N.T., 9/30/10, at 103. Clearly, however, a conclusion that Appellant killed the victim would satisfy the infliction-of-serious-bodily-injury element of robbery. Indeed, the trial court's instruction narrowed the range of conduct for which Appellant was culpable for robbery and, thus, he suffered no prejudice as a result of the court's modification in this regard.

The court did not directly define the *mens rea*, or intent element, of robbery. Notably, no such element appears in the statute. Instead, the court instructed the jury that a robbery occurs when a killing occurs during the course of a theft. The court then defined theft as "taking unlawful control of or exercising unlawful control over someone else's property and *intending not to give it back*." **Id.** at 104 (emphasis added). Thus, the court included an intent element in its definition of robbery by incorporating the 'intent to steal' element of theft. Consequently, Appellant's contention that the trial court failed to define the intent element of robbery *at all* is meritless. The trial court's instructions required, at a minimum, that the jury find that Appellant *intended* to keep the items stolen during the course of the robbery.

Appellant argues, however, that this invited the jury to convict Appellant of second degree murder if the Appellant killed the victim during the course of a theft rather than during a robbery. Theft is not an offense

enumerated in 18 Pa.C.S. § 2502(d) and, therefore, Appellant is correct that a conviction for theft cannot sustain a conviction for second degree murder. Moreover, it is true that our Supreme Court has previously held that robbery consists of two elements: "(1) The *felonious intent to take money or goods from the person*, presence or control of another; and, (2) the accomplishment of that end by violence or putting in fear." ***Commonwealth v. Simpson***, 260 A.2d 751, 754 (Pa. 1970) (emphasis added). Appellant contends that "the intent to rob is markedly different from the intent to commit a theft." Appellant's Brief at 12.

However, we view the difference between "intending not to give it back" and "felonious intent to take money or goods from the person" to be, at best, illusory. The ***Simpson*** Court's definition predates the substantial adoption of the Model Penal Code as our Crimes Code, which did not occur until 1973. Indeed, "felonious intent" is not used to describe any offenses defined by our Crimes Code. ***See generally*** 18 Pa.C.S. § 302 (General requirements of culpability). Thus, the ***Simpson*** Court's definition of the intent element of robbery was superseded by the adoption of the Crimes Code in 1973. Moreover, we see no reason why, under the current Crimes Code, the specific intent to steal, when accompanied by the use of force or the threat of the use of force, would not be sufficient to demonstrate the *mens rea* element of robbery under the current statute governing that offense. The difference between the offense of robbery and theft is not, or is

no longer, a difference of intent. It is a difference in the manner in which the intended act is accomplished.

Appellant does draw our attention to ***Commonwealth v. Prosdocimo***, 578 A.2d 1273 (Pa. 1990), a case that occurred after the adoption of the Crimes Code. Appellant concedes that ***Prosdocimo*** is adverse to his position, but claims that his case is distinguishable. We agree that ***Prosdocimo*** is adverse to Appellant's position, but we disagree that his case is distinguishable.

In ***Prosdocimo***, our Supreme Court reversed the decision of this Court granting Prosdocimo a new trial because of a "confusing and incorrect jury instructions on felony-murder and robbery…." ***Id.*** at 1274. As our Supreme Court explained:

> The crux of the Superior Court holding is that the trial judge's instructions interchanged the legal definitions of robbery and theft in such a way as to confuse the jury and permit the jury to convict Prosdocimo of felony-murder if he participated in a theft, whereas the law requires that felony-murder be predicated on one of several enumerated felonies, including robbery but excluding theft. The Commonwealth, as appellant, challenges this holding, claiming instead that the jury instructions were not incorrect or misleading, and that they were no more complicated than necessary in view of the complexity of the law of felony-murder.

***Id.***

Appellant adopts a similar argument to the one addressed in ***Prosdocimo*** – that the jury may have been permitted to convict Appellant of second degree murder due to his participation in a theft. However, our

- 12 -

Supreme Court criticized the Superior Court's decision in **_Prosdocimo_** for failing to "examine the charge in its entirety." **_Id._** at 1276. Our Supreme Court noted that "[t]he trial court instructed the jury four times during its charge that the underlying felony was robbery and nowhere stated that the homicide might be felony-murder if it occurred during a theft rather than a robbery." **_Id._**

We have the same concern here. Appellant's evaluation of the trial court's jury charge is hypercritical. Although the trial court's charge could have been clearer, the court never instructed the jury that it could find Appellant guilty of second degree murder based upon the commission of a theft, rather than a robbery. To the contrary, the trial court specifically instructed the jury that it must find that Appellant committed a robbery to convict him of second degree murder. Moreover, because we are not convinced that the court was required to instruct the jury that Appellant "intended to rob" rather than "intended to steal," we conclude that Appellant's claim lacks arguable merit.

Nevertheless, even if there were arguable merit to Appellant's claim, Appellant cannot possibly demonstrate that he was prejudiced by counsel's failure to object to the jury charge under the facts of this case. Had the trial court explicitly instructed the jury that it was required to find that Appellant intended to rob the victim, we have no doubt that the jury would have reached the same result. Two eyewitnesses testified that Appellant demanded that the victim turn over his personal property at gunpoint, that

- 13 -

Appellant specifically threatened to shoot the victim if he did not comply with that demand, and that Appellant did, in fact, shoot the victim during the encounter. It is simply not plausible that the jury's decision would have turned on the question of whether Appellant intended to rob the victim versus whether he merely intended to steal from him. The facts adduced at Appellant's trial demonstrate overwhelmingly that Appellant intended to commit a robbery. Accordingly, we also conclude that Appellant could not have been prejudiced by trial counsel's failure to object.

**II.**

Appellant also claims that trial counsel ineffectively failed to object on confrontation and/or hearsay grounds to a Commonwealth witness's testimony regarding a statement made by Amin Vicks' identifying Appellant as the shooter, where Amin Vicks did not testify at Appellant's trial. We agree with the PCRA court that this statement should not have been admitted, as it was inadmissible on both hearsay and confrontation clause grounds. However, we also agree with the PCRA court that Appellant cannot demonstrate prejudice because there is no reasonable probability that the outcome of his trial would have been different had this statement been excluded.

The PCRA court determined that Amin Vick's statement was merely cumulative of the testimony of eyewitnesses Curtis Smith and Ozzie Clark and, as such, Appellant could not demonstrate outcome-determinative prejudice. As our Supreme Court noted in **Commonwealth v. Chmiel**, 889

- 14 -

A.2d 501, 521 (Pa. 2005), harmless error exists where "the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence[.]" *Id.* at 521 (citing *Commonwealth v. Robinson*, 721 A.2d 344, 350 (Pa. 1998)). Here, the erroneously admitted statement, which was not itself an extensive or detailed statement regarding the shooting, was merely cumulative of the eyewitness accounts of Curtis Smith and Ozzie Clark, both of whom testified at length at Appellant's trial to the same information: that Appellant shot the victim, Kenyatta Smith. Thus, Appellant could not have been significantly prejudiced by trial counsel's failure to object.[6]

## III.

Next, Appellant asserts that trial counsel was ineffective for failing to object to Dr. Collins' testimony because Dr. Collins did not perform the autopsy on the victim, nor did he write the autopsy report referenced in his testimony. Appellant contends this testimony violated his confrontation clause rights under *Crawford v. Washington*, 541 U.S. 36 (2004).

---

[6] Appellant argues that "the Amin Vick identification was the strongest one presented by the Commonwealth" because it was the only unimpeached identification of Appellant as the shooter. Appellant's Brief at 25. Appellant does not cite to any portion of the record where this statement was repeated, nor has he identified where in the record the Commonwealth relied upon this statement. Indeed, our review of the Commonwealth's closing argument reveals that Amin Vick was only mentioned once, in passing, and that the statement in question was never referenced. Accordingly, Appellant's characterization that the Amin Vick's statement was the strongest evidence against Appellant is simply belied by the record.

- 15 -

Appellant argues that Dr. Collins provided the Commonwealth's only evidence regarding the victim's cause of death. Furthermore, Appellant asserts that the medical examiner who did performed the autopsy, Dr. Gregory McDonald, was not unavailable to testify merely because he had left the medical examiner's office to take a faculty position at the Philadelphia College of Osteopathic Medicine. The PCRA court rejected this IAC claim because it found that Dr. Collins had come "to [his] own independent conclusion" with regard to the victim's cause of death. N.T., 7/9/13, at 4.

In *Commonwealth v. McCloud*, 322 A.2d 653 (Pa. 1974), the trial court permitted the Commonwealth to admit "substantial portions of the written report of the official, salaried medical examiner who performed an autopsy on the deceased," where "[t]he medical examiner was not called to testify [because,] at the time of trial[,] he was attending a convention." *Id.* at 654. Although it recognized the evidence as hearsay, the trial court allowed the autopsy report to be admitted under the business records exception to the hearsay rule. Our Supreme Court ultimately granted McCloud a new trial because "the Commonwealth could have produced the maker of the autopsy report, but did not. Its failure to do so clearly was error of constitutional dimension." *Id.* at 657.

However, in *Commonwealth v. Mitchell*, 570 A.2d 532 (Pa. Super. 1990), this Court reached a different result. In that case, a medical examiner, Dr. Robert Catherman, testified "as to the manner and cause of the victim's death." *Id.* at 534. However, Dr. Catherman's testimony "was

- 16 -

based on autopsy reports prepared by Dr. Kenneth Carpenter, who was unavailable for trial because he had moved to Germany." ***Id.*** Yet, the ***Mitchell*** Court rejected the appellant's confrontation clause claim on the following grounds:

> Experts may offer testimony based on the reports of others. ***Commonwealth v. Thomas***, 444 Pa. 436, 443, 282 A.2d 693, 698 (1971). In homicide cases, pathologists may base their opinions on facts from autopsy reports prepared by others. ***Commonwealth v. Smith***, 480 Pa. 524, 391 A.2d 1009 (1978). The present case is distinguishable from ***Commonwealth v. McCloud***, 457 Pa. 310, 322 A.2d 653 (1974), cited by appellant. In ***McCloud***, the Commonwealth read substantial portions of the autopsy report, including opinions and conclusions, into the record. The Commonwealth relied on the business records exception to the hearsay rule. In the present case, Dr. Catherman did not read any of Dr. Carpenter's opinions or conclusions. He read only the facts contained in the report,[2] and based his own opinion on those facts. Furthermore, in ***McCloud***, the medical examiner who prepared the report was away temporarily attending a convention. The court emphasized the fact that the Commonwealth could have produced him. In the present case, the person who prepared the report moved out of the country, and was not available to testify.
>
> ___
>
> [2] The facts upon which Dr. Catherman based his report were merely Dr. Carpenter's observations of the nature and location of various injuries and results of various tests. Dr. Catherman drew his own conclusions as to the cause of these facts.

***Mitchell***, 570 A.2d at 534.

The facts of the instant case fall between those present in ***McCloud*** and ***Mitchell***. However, after careful consideration, we conclude that the operative facts in this case are more analogous to those present in ***Mitchell***. Here, Dr. Collins utilized the facts presented by the autopsy report prepared

by Dr. McDonald, but arrived at his own opinion regarding the manner of death. N.T., 9/29/10, at 32. Thus, the jury was presented with an expert witness who came to his own conclusions based upon the facts presented in the autopsy report, and Appellant has not demonstrated that Dr. Collins relied on opinions contained in the report. There is little or no evidence of record regarding why Dr. McDonald was unavailable, particularly since there was testimony that Dr. McDonald was teaching at a school in Philadelphia. While this latter fact is concerning to us, we do not find it dispositive in this case. Thus, we conclude that Appellant's claim lacks merit.

In any event, we also conclude that Appellant cannot demonstrate that he was prejudiced by trial counsel's failure to object to Dr. Collins' testimony, even if that testimony should have been excluded. In this case, there is no serious dispute regarding the manner of the victim's death, nor, for that matter, that the victim did, in fact, die. Appellant has not proffered any evidence or, indeed, any theory, regarding why there would be any serious doubt regarding the fact that the victim was dead, and/or that he died from a gunshot wound.[7] Indeed, Kenyatta Smith died at the scene of the shooting, which had been witnessed by both Curtis Smith and Ozzie

_____

[7] Of course, Appellant did not have a burden of offering such evidence or theories during his trial. However, it is his burden on appeal, and particularly in an appeal from a collateral proceeding, to prove that the underlying error and ineffectiveness of counsel resulted in outcome-determinative prejudice.

Clark, as detailed above. Furthermore, Police Officer Lisa Conroy testified that when she arrived at the scene of the crime, in response to a radio call that was received at 3:19 a.m., medics were already transporting the victim to Temple Hospital. N.T., 9/28/10, at 85-87. Officer Conroy immediately went to the hospital to check on the status of the victim. *Id.* at 85. When she arrived, she discovered that the victim had been declared dead at 4:04 a.m. *Id.* at 85-86. Moreover, Officer Conroy was able to identify the victim by the contents of his wallet. *Id.* at 88.

Given these circumstances, this is not a case where expert medical testimony was *necessary* to prove the manner of death. Indeed, our Supreme Court has held, as a general proposition, that "medical testimony is not required to prove the cause of death." *Commonwealth v. Gilman*, 401 A.2d 335, 339 (Pa. 1979) (citing *Commonwealth v. Ilgenfritz*, 353 A.2d 387 (Pa. 1976)). In *Gilman*, the High Court determined that a witness's "testimony that appellant beat decedent with a blunt instrument and the subsequent discovery of decedent's body are evidence of the cause of death." *Id.* Similarly, in *Ilgenfritz*, our Supreme Court stated that "[w]hile it is true, of course, that the Commonwealth must prove causation, like every element of a crime, beyond a reasonable doubt, it does not follow that only medical testimony can prove causation." *Ilgenfritz*, 353 A.2d at 390.

There is some authority to the contrary. *See Commonwealth v. Baker*, 445 A.2d 544 (Pa. Super. 1982) (holding lay coroner's opinion insufficient to prove causation of death in the absence of an autopsy where

the victim had died following a collision with the intoxicated defendant's vehicle); however, two factors lead us to reject *Baker* as controlling authority in this instance. First, the instant case is factually distinguishable from *Baker* because there were eyewitnesses to the shooting of the victim, whereas no comparable testimony existed in *Baker*. Second, the *Baker* holding, a decision of the Superior Court, did not distinguish itself from our Supreme Court's rulings in *Gilman* and *Ilgenfritz*, nor even recognize those decisions as contrary authorities, on the question of whether expert medical testimony was necessary to prove the manner of death.

Here, there was ample circumstantial evidence for the jury to have determined, even without the testimony of Dr. Collins, that Kenyatta Smith died, and that the manner of his death was homicide by gunshot. The facts of this case regarding the manner and cause of death are not beyond the comprehension of a lay juror. Consequently, we conclude that Appellant cannot demonstrate that there is a reasonable probability that the result of his trial would have been different had trial counsel successfully convinced the trial court to exclude the testimony of Dr. Collins. As such, Appellant's third IAC claim lacks merit.

**IV.**

Finally, Appellant claims that trial counsel was ineffective for failing to ask for a *Kloiber* jury instruction, because the in-court identifications provided by Curtis Smith and Ozzie Clark were suspect. Both witnesses had failed to identify Appellant until long after the shooting occurred. Recently,

our Supreme Court addressed the applicability of **Kloiber** charges as follows:

> A **Kloiber** charge is appropriate where there are special identification concerns: a witness did not have the opportunity to clearly view the defendant, equivocated in his identification of a defendant, or had difficulty making an identification in the past. **Commonwealth v. Rollins**, 558 Pa. 532, 738 A.2d 435, 448 n. 14 (1999); **Commonwealth v. Gibson**, 547 Pa. 71, 688 A.2d 1152, 1163 (1997). However, "[w]hen the witness already knows the defendant, this prior familiarity creates an independent basis for the witness's in-court identification of the defendant and weakens ineffectiveness claims based on counsel failure to seek a **Kloiber** instruction." **Commonwealth v. Ali**, 608 Pa. 71, 10 A.3d 282, 303 (2010) (citations omitted).

**Commonwealth v. Reid**, 99 A.3d 427, 448 (Pa. 2014).

Here, both Curtis Smith and Ozzie Clark testified that they had known Appellant for many years. The also both testified that the only reason that they did not come forward sooner to identify Appellant as the shooter was because both feared reprisals for cooperating with police, not because of any difficulty in their ability to observe or identify Appellant at the time of the shooting. Accordingly, there was no basis for a **Kloiber** charge to be issued to the jury, and counsel could not have provided IAC for failing to request it.

Having found no merit to any of Appellant's IAC claims, we affirm the order of the PCRA court denying Appellant's PCRA petition.

Order **affirmed**.

Judge Lazarus joins the memorandum.

Justice Fitzgerald concurs in the result.

- 21 -

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 2/23/2015